UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RICHARD EARLE,**

      **Plaintiff,**                                    Case No. 2:04-cv-876
                                                                **JUDGE GREGORY L. FROST**
      **v.**                                                    Magistrate Judge Mark R. Abel

**NETJETS AVIATION, INC.,**

      **Defendant.**

## OPINION AND ORDER

This case requires the Court to review an arbitrator's award that was issued pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. *et seq*. Plaintiff, Richard Earle, and Defendant, NetJets Aviation, Inc., have filed competing briefs seeking judgment on the administrative record. (Docs. # 12, 14, 15.)  For the reasons that follow, the Court enters judgment in favor of NetJets Aviation, Inc.

### I.  Background

Plaintiff, Richard Earle, had been a pilot for Defendant, NetJets Aviation, Inc. ("NetJets") since April 1994.  On December 3, 2001, NetJets Anti-Drug and Alcohol Technician Rita Lohr called Earle on his cellular phone.  Lohr instructed Earle to report for a random drug and alcohol test, but after Earle told Lohr that he was absent from work that due to illness, she cancelled the test.  Lohr subsequently called Earle again on December 17, 2001 and instructed him to report to a third-party medical facility for a drug and alcohol test.  Earle was again not at work at the time of the contact, but was at his home in Pensacola, Florida.  The testing facility

1

was approximately 350 miles from Earle's home, but one mile from the Jacksonville airport from which Earle worked.

Earle arrived at the testing facility five hours and fifty minutes after speaking with Lohr. He took the test, which did not detect either the presence of alcohol or drugs. NetJets removed Earle from flight status on that date, however, and on December 21, 2001, NetJets Chief Pilot Jim Peters placed Earle on unpaid suspension. The grounds for this suspension were that Earle had refused to take a drug and alcohol test by taking so long to arrive at the testing facility. The company also notified the Federal Aviation Administration, which can investigate and punish testing refusals.

Earle filed a grievance over the suspension on December 26, 2001. Thereafter, on January 3, 2002, Peters informed Earle that he was being terminated for refusing to submit to a drug and alcohol test.[1] Earle filed a grievance related to his termination the next day. A Systems Board of Adjustment hearing was held on March 22, 2002 in regard to both grievances, but when the Board was unable to reach a resolution, the matter proceeded to arbitration. The arbitrator issued a September 30, 2003 decision in which he concluded that Earle had indeed refused to submit to the alcohol test.

Earle subsequently filed the instant action on September 10, 2004. (Doc. # 1.) He asserts that the arbitral decision conflicted with the collective bargaining agreement (Count I), that the decision imposed additional requirements not contained in the agreement (Count II), and that the

---

[1] NetJets offered other alternative reasons for Earle's dismissal, but the arbitrator did not rely upon these reasons. Accordingly, they are not before this Court and need not be discussed here.

2

decision neither had rational support in nor could rationally be derived from the agreement (Count III).  The matter is to be decided on the administrative record (Docs. # 17, 18) and the parties' merit briefing (Docs. # 12, 14, 15).

## II.  Analysis

### A.  Standard Involved

The Sixth Circuit has explained that a federal court has a "very narrow standard of review" of an arbitration decision under the RLA so that

> An arbitrator's award will be overturned for failure to draw its essence from the agreement only where 1) the award conflicts with the express terms of the agreement, 2) the award imposes additional requirements that are not expressly provided in the agreement, 3) the award is without rational support or cannot be rationally derived from the terms of the agreement, or 4) the award is based on general considerations of fairness and equity rather than the precise terms of the agreement.

*Airline Professionals Ass'n of Int'l. Broth. of Teamsters, Local Union No. 1224, AFL-CIO v. ABX Air, Inc.*, 274 F.3d 1023, 1030 (6th Cir. 2001).  Arbitral decisions are thus subject to a standard of review that has been characterized as "among the narrowest known to the law." *Id.* (citing *Atchison, Topeka & Santa Fe R.R. Co. v. Buell*, 480 U.S. 557, 563 (1987)).  *See also International Brotherhood of Teamsters, AFL-CIO v. United Parcel Service Co.*, 447 F.3d 491, 498 (6th Cir. 2006).

The Sixth Circuit indicated that "this standard of review is narrower even than the highly deferential 'abuse of discretion' standard." *Jones v. Seaboard System Railroad*, 783 F.2d 639, 642 (6th Cir. 1986).  The Supreme Court explained the rationale behind this restrictive standard as follows:

>The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, ... 29 U. S. C. § 173(d), provides that '[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.' ... Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38 (U.S. 1987).[2]

As a result, "an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them." *Id.* In other words, if: (1) the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority; (2) the award "draw[s] its essence from the contract," and (3) the award does not "reflect the arbitrator's own notions of industrial justice," a court cannot overturn the award even if the court is convinced that the arbitrator committed a "serious error." *Id.* Consequently, in determining whether the board exceeded its authority, the Court must "broadly construe the [A]greement and resolve all doubts in favor of the Board's authority." *Zeviar v. Local No. 2747, Airline, Aerospace and Allied Employees*, *IBT*, 733 F.2d 556, 559 (8th Cir. 1984).

---

[2] Although *Misco* addressed the review of an arbitration award under the Labor Management Relations Act, *Misco* has been applied to awards under the RLA. *See Airline Professionals Ass'n, Teamsters Local Union 1224 v. ABX AIR, Inc.*, No. 04-cv-663, 2005 U.S. Dist. LEXIS 25345 (S.D. Ohio 2005); *Jetstream Int'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, No. C-3-91-204, 1993 U.S. Dist. LEXIS 21304 (S.D. Ohio 1993). *See also American Train Dispatchers Ass'n v. CSX Transp., Inc.*, No. 1:04-CV-1433, 2005 U.S. Dist. LEXIS 21370 (N.D. Ohio 2005).

4

In reviewing arbitration awards involving minor disputes,[3] this Court may not vacate the award simply because it disagrees with the arbitrator's interpretation of the collective bargaining agreement.  *Id.*  This is so because the parties "authorized the arbitrator to give meaning to the language of the agreement."  *Id.*  Following that logic, courts also lack authority to disagree with an arbitrator's decision regarding remedies for contract violations.  *Id.*  The Supreme Court commented that to permit the Courts to do otherwise would result in interference with the "speedy resolution of grievances by private mechanisms."  *Id*

**B.  Discussion**

Earle argues that the arbitral decision must be overturned for two basic reasons.  First, he asserts that because he was not under a duty to take the drug and alcohol test, he cannot be held to have constructively refused to take the test.  Second, Earle contends that even if he was required to take the test, the collective bargaining agreement only required that he proceed immediately to the testing facility, not that he had to arrive there within a specified period of time.  Neither of these grounds are well taken.

The issue of whether Earle was required to take the drug and alcohol test is answered by the obligations imposed on him by the collective bargaining agreement.  That agreement provides:

> The Company shall have the right to discharge or to otherwise discipline any employee for just cause.  The Company's business requires adherence to the highest standards of safety and the maintenance of tight scheduling of flights.  In view of these requirements and without limiting the generality of the foregoing, it

---

[3] Under the RLA, "[m]inor disputes include claims involving the meaning or application of an existing collective bargaining agreement provision to a specific situation or case." *Wolfe v. Norfolk Southern Railway Co.*, 66 Fed.Appx. 532, 535, 2003 WL 2007936, at *3 (6th Cir. 2003).

5

>shall be just cause for discharge if any employee violates the Company's rule against consumption of alcoholic beverages within twelve (12) hours prior to flight departure time, or if any employee fails to comply with the requirements of the company's AAA-required Alcohol Misuse Prevention Program and Anti-Drug Program.

(R. at 14-15.)[4] The agreement thus incorporates by reference the terms of NetJets' Alcohol Misuse Prevention Program, which provides that "if an Executive Jet employee refuses to submit to any required alcohol test in this program, he/she will be terminated from employment."[5] (R. at 784.) The alcohol program states that "fail[ing] to provide adequate breath for testing without a valid medical explanation" or "engag[ing] in conduct that clearly obstructs the testing process" constitutes a refusal to submit to an alcohol test. (R. at 787.)

The extant question is thus what constitutes a "required alcohol test." The alcohol program provides that specified categories of "are subject to alcohol testing and must refrain from consuming any alcohol ... whenever they are preforming, ready to perform, or immediately available to perform" various identified functions. (R. at 789.) The program also states:

>Employees will only be tested for alcohol while they are at the work site (this could include airports other than our home base). Therefore, a pilot on call for duty while at home has not violated the regulations if he or she has an alcoholic beverage unless he or she reports for duty within 12 hours of consuming such

---

[4] For ease of reference, the Court has cited to the contract language set forth in the numbered record via the arbitrator's decision. The entirety of the collective bargaining agreement itself is not numbered by each page in accordance with the consecutive numbering of the initial portion of the record. The agreement can be found later in the record as Ex. J-1, with the quoted § 2.4 at P29, which comes after page 999 of the consecutively numbered record pages.

[5] The alcohol program additionally provides that "[c]overed employees may not refuse to submit to a post-accident, random, reasonable suspicion, or follow-up alcohol test. Any Executive Jet employee who refuses to submit to any required alcohol test in this program, will be subject to termination." (R. at 791.)

6

> alcohol. He or she is not subject to alcohol testing until he or she reports for work. Therefore, if he or she is called to work and has consumed alcohol within the 12 hour time-frame, he or she would have to decline to report until 12 hours has passed with no alcohol consumption. However, a pilot waiting to fly an aircraft in the employee's lounge is subject to testing as he or she is immediately available to fly the aircraft.

(R. at 789.) Additionally, the program provides that "[r]andom tests will be conducted while the employee is performing safety-sensitive functions, just before the employee is to perform safety-sensitive functions, or just after the employee has ceased performing safety-sensitive functions." (R. at 791.)

Earle argues that NetJets could not have required him to take the alcohol test because (1) he was not at the work site, but at his home, (2) he had not reported for work, but was only on call for duty, and (3) he was not performing or about to perform safety-sensitive functions. Therefore, Earle reasons, the arbitrator's decision that he was under a duty to submit to random testing conflicts with the pertinent agreement provisions, imposes a requirement on him extraneous to the agreement, and is not rationally derived from the agreement.

NetJets counters by pointing out that the arbitrator correctly read the alcohol program's construction of a work site to include "Gateway" airports, or airports other than NetJet's home base. (R. at 789.) Evidence presented at the hearing indicated that in light of the Gateway System–a program in which pilots could begin and end their tours of duty at (and thus be tested at) airports other than the main Columbus, Ohio facility–pilots such as Earle were required under the collective bargaining agreement to submit to random tests at other facilities located near their Gateway airports.

Thus, the arbitrator reasoned, Earle was required to report to report to the Jacksonville

7

testing facility for the Florida Gateway airport because his tour of duty had begun and his initial assignment was to take the drug and alcohol test. Earle was, for purposes of the program, considered available and ready to perform on-demand safety-sensitive functions. The arbitrator specifically credited the testimony of NetJet's Lohr and Richard Smith that Earle's at-home notification was a normal *custom and practice* for Gateway pilots that filled the gap left by both the collective bargaining agreement's and the alcohol program's silence on notification, concluding that "there is no firm basis upon which to find that [Earle] was improperly notified regarding his taking an alcohol and drug test on December 17, 2001." (R. at 23.) An arbitrator may permissibly credit the past practices of parties in construing a collective bargaining agreement. See *ABX Air, Inc.*, 274 F.3d at 1031 ("the Board was interpreting the agreement in light of federal case law, generally accepted labor principles, and the past practices of the parties"). This Court is not free to reject the arbitrator's factual finding and in turn credit the contrary and rejected testimony of Mitchell Mitchel that posited a more restrictive scheme in which notification and the obligation to take a test were linked solely to a pilot's on-site presence.

The Court therefore cannot say that the arbitrator's decision was not rationally derived from the less-than-comprehensive terms of the agreement so that it failed to draw its essence from that agreement. There is no impermissible imposition of additional terms, then, but only necessary implementation of the agreement requirements as implemented through routine custom and practice (which are apparently accepted within the overall NetJets-pilot relationship).

As noted, Earle also argues that the collective bargaining agreement only required that he

8

proceed immediately to the testing facility and not that he had to arrive there within a specified period of time. The incorporated alcohol program states that "[e]mployees notified of selection for random testing must proceed immediately to the testing site." (R. at 791.) Neither the agreement nor the program further target a temporal requirement expressly, but by logical inference they call for immediate travel to the designated facility. Additionally, a federal regulation on alcohol testing provides that "[a]s an employee, you are considered to have refused to take an alcohol test if you ... [f]ail to appear for any test (except a pre-employment test) within a reasonable time, as determined by the employer, consistent with applicable DOT agency regulations, after being directed to do so by the employer." 49 C.F.R. § 40.261(a)(1). This regulation thus imposes only a "reasonable time" reporting requirement, charging NetJets with determining what amount of time is reasonable.

Accordingly, the collective bargaining agreement and alcohol program do impose a temporal requirement. Upon notification, a pilot such as Earle must proceed immediately to the testing facility–and must arrive there within a reasonable time. Any other construction, such as one requiring a pilot to *leave* immediately for the facility but permitting him or her to *arrive* there whenever, is nonsensical. Proceeding contemplates traveling from a beginning point to an end point, not just a departure. Thus, contrary to Earle's assertion, the agreement does not fail to specify a time at which an employee must be present for testing after notification. Rather, the agreement contemplates an immediate progression from the departure point to the testing facility, with the immediacy indicating a time-is-of-the-essence component.[6] Here, the arbitrator

---

[6] Earle concedes that delay associated with other activities between notification and arrival–such as a pilot first going to dinner before arriving at the testing facility–would be unreasonable delay. But his argument rests too dubiously on a distinction between an obvious,

9

found as a factual matter that Earle's unreasonable delay from notification to arrival was not proceeding immediately.

Two additional comments are necessary in regard to this temporal requirement issue. First, NetJets argues that a reasonable time is defined in part by the presumptively acceptable three-hour travel time contained within a location requirement applicable to on-duty pilots.[7] The company posits that by targeting specified on-duty employees and requiring them to be within a specific mile or travel-time proximity to a worksite testing facility, the agreement and incorporated alcohol program define reasonableness. Because Earle's reporting for testing fell outside this three-hour window, NetJets contends, it was thus unreasonable and in violation of the alcohol program/collective bargaining agreement. Earle correctly points out, however, that the arbitrator expressly declined to regard the Gateway directive as controlling. Rather, the arbitrator regarded Earle's travel time as unreasonable regardless of the Gateway mandate. (R. at 17-18.)

Second, the arbitrator's conclusion accounted for construing a "reasonable time" to permit allowances "for some variance based on particular circumstances," but nonetheless found that Earle's reporting time of five hours and fifty minutes was unreasonable. (R. at 17.) In reaching this conclusion, the arbitrator evaluated Earle's testimony that he had become lost and

---

unreasonable lack of immediacy such as in the example he describes and the unexplained (due to rejected testimony) delay present in his own delay on December 17, 2001. A lack of immediacy is a lack of immediacy.

[7] When he received notification of his selection for testing on December 17, 2001, Earle was in violation of a requirement that he be within 100 miles or 3 hours (whichever is shorter) of the Jacksonville airport, his Gateway airport. The Gateway policy provides that "[c]rewmembers must be in position at their gateway airport to commence a duty period as defined in the current contract." (R. at 751.)

experienced traffic delays, noted Earle's "lack of credibility as a witness," and "overwhelmingly found" that said testimony was "not credible." (R. at 18.) The arbitrator cited the "internal implausibility" of Earle's account and "its being in direct conflict with other reliable evidence in the record." (R. at 18-19.) The arbitrator also stated that "[a]s to the credibility of [Earle] as a witness, it is determined to be lacking in a profound sense." (R. at 19.) The arbitrator identified where Earle had lied, noted that Earle had urged a friend to lie on his behalf, and emphasized that Earle's account was"wholly implausible." (R. at 19-20.) Similarly, the arbitrator found as fact that, as an experienced pilot, Earle knew of a temporal requirement in which time was of the essence. The arbitrator rejected Earle's contention that he did not know of a time requirement as "preposterous." (R. at 21.) This Court is neither inclined to nor free to reject such factfinding.

Therefore, regardless of any FAA action or the actual test results, Earle violated the alcohol program by arriving at the testing facility in what the arbitrator found to be an unreasonable period of time. By consequently constructively refusing to take the test, Earle in turn violated his obligation to comply with the collective bargaining agreement, and such conduct constituted just cause for dismissal. Regardless of whether this Court would agree with the arbitrator's factual determinations, the Court cannot ignore those determinations. The controlling factual determinations compel this Court to recognize that the arbitrator's decision conforms with the collective bargaining agreement and its expressly and implicitly incorporated provisions, rationally draws its essence from that agreement, and does nothing more than apply conditions contemplated by the agreement.

## II. Conclusion

For the foregoing reasons, the Court finds in favor of NetJets and **AFFIRMS** the

arbitrator's decision.  The Clerk is instructed to enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

    **IT IS SO ORDERED.**

                                          /s/   Gregory L. Frost
                                         GREGORY L. FROST
                                         UNITED STATES DISTRICT JUDGE